# UNITED STATES DISTRICT COURT

**FILED**

for the

Northern District of Texas

**January 31, 2022**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )     Case No.   3:22-MJ-85-BK |
| INFORMATION ASSOCIATED WITH | ) |
| ALYJOEMEDIA@GMAIL.COM | ) |
| THAT IS STORED AT PREMISES CONTROLLED BY Google LLC | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
    See attachment A.

located in the     Northern     District of     California     , there is now concealed *(identify the person or describe the property to be seized)*:
    See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371, | Conspiracy to Commit Offense or Defraud the United States |
| 18 U.S.C. § 1028, | Fraud in Connection with Identification Documents |
| 18 U.S.C. § 1035 | False Statements Related to Health Care Matters |

The application is based on these facts:
See attached affidavit in support of claim.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

HHS Special Agent Lusilla Pacheco
*Printed name and title*

Agent sworn and signature confirmed via reliable electronic means, pursuant to Fed. R. Crim. P. 41(d)(3).

Date:    January 31, 2022 _____

_____
*Judge's signature*

City and state:    Dallas, Texas

RENEE HARRIS TOLIVER, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **ALYJOEMEDIA@GMAIL.COM** THAT IS STORED AT PREMISES CONTROLLED BY **Google LLC** | Case No. __3:22-MJ-85-BK__ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Lusilla Pacheco, a Special Agent with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), being duly sworn, depose and state under oath the following:

## A.    INTRODUCTION

1.    I make this affidavit in support of an application pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703, for a search warrant to:

   a.    search all records, data, and information associated with the email
        address **alyjoemedia@gmail.com** (the "**Target Account**") that is
        electronically stored at premises owned, maintained, controlled, or
        operated by Google LLC ("Google"), an electronic communications,
        website, and cloud services provider headquartered at 1600
        Amphitheatre Parkway, Mountain View, California 94043, accepting
        service at the electronic address of USLawEnforcement@google.com,
        more fully described in Attachment A, and to seize items described in

**Affidavit—Page 1**

Attachment B.

2.      The Target Account with provider Google is hosted on computer servers owned, maintained, controlled, and/or operated by the respective provider identified in Attachment A, Google.

3.      The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the Government copies of records and information in its possession pertaining to the subscriber or customer associated with the **Target Account**, including the content of communications as further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### B.      IDENTITY AND EXPERIENCE OF AFFIANT

4.      I am a Special Agent of the United States Department of Health and Human Services-Office of Inspector General ("HHS-OIG") and have been employed as a Special Agent since 2016.  As such, my duty is to conduct criminal and civil investigations involving programs and operations of the Department of Health and Human Services, including both Medicare and Medicaid fraud.  I am currently assigned to the Kansas City Region and work in the Denver Field Office.  I have investigated matters concerning crimes against the United States, including numerous and varied health care-related crimes.  I have also attended basic and continued training on federal laws and effectuated

a wide range of law enforcement methods when conducting criminal and civil investigations.  I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a), and I am thereby authorized to request the issuance of a federal search warrant.

### C.  PURPOSE OF THE AFFIDAVIT

5.     As described more fully below, there is probable cause to believe that located in the **Target Account** there exists evidence of crimes, fruits of crimes, contraband, and other items illegally possessed in violation of federal laws, including 18 U.S.C. § 371 (Conspiracy to Commit Offense or Defraud the United States), 18 U.S.C. § 1028 (Fraud in Connection with Identification Documents), and 18 U.S.C. 1035 (False Statements Related to Health Care Matters), as described in Attachment B.

6.     The statements in this affidavit are based upon information I learned during the investigation, information provided to me by investigative personnel of the Department of Homeland Security Investigations ("HSI"), as well as information obtained from public sources and business records and my experience and background as a Special Agent.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

7.     Because this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of crimes, fruits of crimes, contraband, and other items illegally possessed, in violation of federal laws, including 18

U.S.C. § 371, 18 U.S.C. § 1028, and 18 U.S.C. § 1035, are currently located in the

**Target Account**.

### D.   <u>TARGET OFFENSES</u>

<u>*Conspiracy to Commit Offenses Against, and to Defraud, the United States*</u>

8.      Title 18, United States Code, Section 371 prohibits conspiracy to commit

any offense or to defraud the United States:  "If two or more persons conspire either to

commit any offense against the United States or to defraud the United States, or any

agency thereof in any manner or for any purpose, and one or more of such persons do any

act to effect the object of the conspiracy, each shall be fined under this title or imprisoned

not more than five years, or both."

<u>*Fraud in Connection with Identification Documents*</u>

9.      Title 18, United States Code, Section 1028(a)(7) prohibits the knowing

transfer, possession, or use, without lawful authority, of "a means of identification of

another person with the intent to commit, or to aid or abet, or in connection with, any

unlawful activity that constitutes a violation of Federal law, or that constitutes a felony

under any applicable State or local law[,]" which includes state laws prohibiting forgery.

<u>*False Statements Related to Health Care Matters*</u>

10.      Title 18, United States Code, Section 1035, prohibits false statements

relating to health care matters: "Whoever, in any matter involving a health care benefit

program, knowingly and willfully— (1) falsifies, conceals, or covers up by any trick,

scheme, or device a material fact . . . in connection with the delivery of . . . health care

benefits, items, or services, shall be fined under this title or imprisoned not more than 5

years, or both. . . As used in this section, the term "health care benefit program" has the meaning given such term in section 24(b) of this title"

11.     Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

## E.     INVESTIGATION BACKGROUND

12.     HHS-OIG and HSI are investigating Robert "Robbie" Van Camp ("Van Camp") and others in connection with a nationwide scheme to produce and sell fake CDC COVID-19 vaccination record cards.  As described in more detail below, this investigation began as a result of a complaint from a member of the public that Van Camp was selling fake CDC COVID-19 vaccination record cards, which falsely stated that the recipients received FDA-authorized COVID-19 vaccines.  The initial complaint was subsequently corroborated by: an additional complaint by a member of the public; numerous statements that Van Camp made to undercover law enforcement agents; sales of fake CDC COVID-19 vaccination record cards (which are visually similar to legitimate CDC vaccination record cards) that Van Camp conducted with two undercover law enforcement agents; and other documents and information obtained in the investigation.  As discussed below, the investigation has determined that Van Camp has conspired with others to impair lawful functions of HHS and the CDC through the

production and sale of fake CDC COVID-19 vaccination record cards in numerous states, including to individuals based in the Northern District of Texas.

**F.    THE FDA COVID-19 VACCINE EMERGENCY USE AUTHORIZATION PROCESS**

13.    On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Food, Drug, and Cosmetic Act ("FD&C Act") (21 U.S.C. § 360bbb-3(b)(1)(C)), the Secretary of Health and Human Services ("HHS") determined that there was a public health emergency that had a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes COVID-19.  On the basis of such determination, on March 27, 2020, the Secretary then declared that circumstances existed justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic, pursuant to Section 564(b)(1) of the FD&C Act (21 U.S.C. § 360bbb-3(b)(1)).

14.    Based on this declaration and determination, the FDA was permitted to issue an emergency use authorization ("EUA") after it had determined that the following statutory requirements were met (Section 564 of the FD&C Act (21 U.S.C. § 360bbb-3)):

      a.  The chemical, biological, radiological, or nuclear agent referred to in the March 27, 2020 EUA declaration by the Secretary of HHS (COVID-19) can cause a serious or life-threatening disease or condition;

      b.  Based on the totality of scientific evidence available, including data from adequate and well controlled trials, if available, it is reasonable to believe

that the product may be effective to prevent, diagnose, or treat such serious

or life-threatening disease or condition that can be caused by COVID-19.

    c.   The known and potential benefits of the product, when used to diagnose,

        prevent, or treat the identified serious or life-threatening disease or

        condition, outweigh the known and potential risks of the product; and

    d.   There is no adequate, approved, and available alternative to the product for

        diagnosing, preventing, or treating the disease or condition.

15.    To date, the FDA has authorized three COVID-19 vaccines for

emergency use: (1) Pfizer-BioNTech COVID-19 Vaccine; (2) Moderna COVID-19

Vaccine; and (3) Janssen COVID-19 Vaccine.

## G.    THE CDC COVID-19 VACCINE CARD PROGRAM REQUIREMENTS

16.    All COVID-19 vaccines in the United States were purchased by the United

States Government for administration exclusively by participating providers through the

Centers for Disease Control ("CDC") COVID-19 Vaccination Program. COVID-19

vaccination providers participating in the CDC COVID-19 Vaccination Program are

required to sign a CDC COVID-19 Vaccination Program Provider Agreement. Providers

are responsible for adhering to all requirements outlined in the Agreement.

17.    All COVID-19 vaccination providers are required to provide patients with

an official CDC COVID-19 Vaccination Record Card. The CDC COVID-19 Vaccination

Record Card lists the name of the manufacturer of the COVID-19 vaccine that the patient

received, the date the patient received it, the dose numbers, and the location where each

dose was administered.

18.     Based on information gathered in this investigation, proof of vaccination as reflected in the CDC COVID-19 Vaccination Record may be required to travel to certain locations, including certain federal building and courthouses; attend certain events where large numbers of people congregate, such as sporting events and concerts; and be employed in certain professional activities, including certain federal government employment.  Proof of vaccination requirements are intended to limit the spread of COVID-19.

## H.     RELEVANT ENTITIES AND INDIVIDUALS

19.     Van Camp resides in Parker, Colorado, and publishes the magazine "Parker Dining Guide," which contains advertisements and promotions from various businesses. Van Camp also heads business networking associations "Parker Best Leads Group" in Parker, Colorado, and "Castle Rock Best Leads Group" in Castle Rock, Colorado.

20.     Dionne Hutton ("Hutton") is married to Van Camp and resides with him in Parker, Colorado.  She is employed by a private contractor in the defense industry, and maintains an active Top Secret security clearance.

21.     Paola Porrone ("Porrone") is a licensed chiropractor, and practices at a medical clinic in Parker, Colorado.  As described in further detail below, evidence obtained during this investigation indicates that Porrone acted as a distributor of Van Camp's fake CDC COVID-19 vaccination record cards.

22.     Sommer Wynn ("Wynn") is an associate of Van Camp, and resides in Castle Rock, Colorado.  As described in further detail below, evidence obtained during this investigation indicates that Wynn acted as a distributor of Van Camp's fake CDC

COVID-19 vaccination record cards and assisted Van Camp's efforts to have the fake cards registered through the CDC "V-Safe" website.

## I.   PROBABLE CAUSE THAT EVIDENCE OF CRIMES IS STORED / LOCATED IN THE TARGET ACCOUNT

*Complainant 1*

23.     On or about August 16, 2021, the Colorado Attorney General's Office received a complaint from Complainant 1.  According to the information provided in the complaint and subsequently obtained through interviews of Complainant 1, Complainant 1 was a member of Van Camp's Parker Best Leads Group in Parker, Colorado, and Castle Rock Best Leads Group in Castle Rock, Colorado.  Complainant 1 witnessed Van Camp offering to sell fake CDC Covid vaccination cards at an April or May 2021 meeting of the Parker Best Leads Group in Parker, Colorado.

24.     On or about August 23, 2021, a Parker, Colorado Police Department Officer interviewed Complainant 1.  During that interview, Complainant 1 stated that Van Camp was offering to sell fake CDC Covid vaccination record cards during a weekly Parker Best Leads Group meeting, which occur every Tuesday morning in Parker, Colorado.  Complainant 1 reported that Van Camp was selling the fake vaccination cards for $20 each and that Van Camp stated that he printed the cards himself.  Complainant 1 said that it was possible that Van Camp printed the fake vaccination cards himself because Van Camp owns the Parker Dining Guide publication.

25.     Complainant 1 told the Parker Police Department that Complainant 1 confronted Van Camp at the Parker Best Leads meeting and told him that he should not

be selling the fake vaccination cards.  Van Camp responded that he did not care about Complainant 1's opinion.  According to Complainant 1, approximately 30 to 40 people were present at the meeting where Complainant 1 confronted Van Camp about selling the fake vaccination cards.

26.    Federal agents interviewed Complainant 1 in September 2021.  During that interview, Complainant 1 confirmed that the information provided in the initial complaint was accurate.  Complainant 1 told federal agents that Van Camp owns and operates both the Parker Best Leads Group and the Castle Rock Best Leads Group.  Complainant 1 works for a company that is a member of both business lead groups and has attended weekly meetings for each group.

27.    In the interview with federal agents, Complainant 1 explained that the meeting where Complainant 1 witnessed Van Camp offering to sell fake vaccination cards occurred in or around April or May 2021.  Complainant 1 said that Van Camp had a pile of fake vaccination cards at the meeting and that there was writing on the fake vaccination cards.  Complainant 1 stated he knows that members of the leads group purchased fake vaccination cards from Van Camp.

28.    Complainant 1 further explained that after Complainant 1 confronted Van Camp at the April or May 2021 meeting about selling the fake vaccination cards, as described above, Van Camp kicked Complainant 1 out of the Parker Best Leads Group. After getting kicked out of the Parker Best Leads Group, Complainant 1 continued to occasionally attend meetings of the Castle Rock Leads Group.  Complainant 1 saw Van

Camp again in possession of fake vaccination cards at a meeting of the Castle Rock Best

Leads Group that occurred in or around June 2021.

*Complainant 2*

29.     Federal agents interviewed Complainant 2 in September 2021.

Complainant 2 works with Complainant 1 and has also attended weekly meetings of the

Parker Best Leads Group and the Castle Rock Best Leads Group.

30.     Complainant 2 saw Van Camp offering to sell fake vaccination cards on

two separate occasions, the first of which occurred at a Castle Rock Best Leads Group

meeting in approximately March or April 2021.  According to Complainant 2, Van Camp

had a two-inch stack of fake vaccination cards and was offering to sell them for $17 to

$20 each.  Complainant 2 heard Van Camp say that he had inside knowledge about

COVID-19 vaccination cards because his wife, Hutton, has a security clearance.

Complainant 2 did not witness any cards being sold, but heard several individuals express

interest in purchasing them.  Complainant 2 also stated that Van Camp has access to

professional grade printing services because he runs a print advertising business and sells

coupon booklets.

*Van Camp Sold Fake Vaccination Cards to Undercover Agent 1*

31.     As part of this investigation, Undercover Agent 1 ("UCA1"), an HSI

Special Agent, contacted Van Camp on September 13, 2021, at phone number 503-949-

8779.[1]  During the call, which was recorded, UCA1 posed as a business owner interested

---

[1] Publicly available information, as well as other sources available to agents, confirmed that
VAN CAMP uses phone number 503-949-8779.

in advertising in the Parker Dining Guide.  The individual who answered UCA1's call identified himself as Van Camp, stating "this is Robbie" in a male voice.  Van Camp told UCA1 about his dining guides, stating that he has owned the guides for 17 years and mails the guides to 40,000 homes in Parker, Colorado and 52,000 homes in Castle Rock, Colorado.  Van Camp stated that he preferred to discuss the cost of advertising in person and arranged to meet with UCA1 on September 20, 2021, at a coffee shop in Castle Rock, Colorado.

32.     During the September 13, 2021, call, Van Camp asked UCA1 "How are you guys doing that whole vaccine bullshit?"  Van Camp then made the following statements:

   a.   "Question… so question… something to think about no rush but I kinda have a hookup on the real real 'V' card, you know what I'm saying?  Like I can hook you and all of your employees up so if anybody asks you can show them the card.  I've done it for about 700 of my customers."

   b.   "I have people that are being terminated from their jobs.  I have police officers that are resigning, or hospital workers, or fire fighters, school-teachers, students.  I help people with them."

   c.   "When I see you, I'll show you my card and if it's something you guys want that will help you, then when people ask, you can say 'yes we have our cards.'"

33.     After UCA1 inquired about purchasing fake vaccination cards, Van Camp stated that each card would cost $120.  Van Camp told UCA1 to send him the names to

put on the vaccination cards either by text or by email to the email address

**alyjoemedia@gmail.com**, which is the **Target Account**.  Van Camp then stated that he

refers to his vaccination cards as "restaurant gift cards."  He told UCA1 to send him an

email to the **Target Account** stating that UCA1 needed restaurant gift cards and to

include the first name, middle initial, last name and birthday of each individuals requiring

a card.  Van Camp said that he would text UCA1 images of the cards after they were

prepared to confirm the information was accurate, and that Van Camp would provide

UCA1 the cards at their September 20, 2021, meeting.  Van Camp reiterated that he has

"helped 700 business owners, and police, and fire, and doctors" obtain fake vaccination

cards.

34.     Later that same day, September 13, 2021, UCA1 sent an email message to

Van Camp at the **Target Account**, with the subject heading "Gift Cards."  UCA1's email

contained the names and birthdates of five individuals.  Van Camp immediately replied

via the **Target Account** and requested the middle initials of the individuals.  After UCA1

sent Van Camp the middle initials, Van Camp replied using the **Target Account** and

stated that he would have the cards available at their September 20, 2021 meeting.  On

September 19, 2021, Van Camp, using phone number 503-949-8779, sent a text message

to UCA1's phone number with a photograph of five fake vaccination cards, bearing the

name of the individuals that UCA1 had provided to Van Camp in his September 13,

2021, email message:



35.     As planned, UCA1 met with Van Camp on September 20, 2021, at a coffee shop in Castle Rock, Colorado.  Van Camp approached UCA1 in the coffee shop, introduced himself as "Robbie," and threw an envelope on the table, stating, "There's your cards."  While UCA1 opened the envelope, which contained the five fake vaccination cards requested in UCA1's September 13, 2021, email message, Van Camp stated, "Pretty fucking nice, huh?  I call them a work of art.  I've been a printer for 30 years so this was easy for me."  UCA1 handed Van Camp $600 in cash as payment for the cards.  Van Camp made the following additional statements during the meeting:

a.  The cards were made with "real paper, size, weight, color, it's the real CDC logo print file."

b.  "I have the Pfizer lot numbers, the vials, for 9-1-21, I get them every month."

c.  "I've done a thousand of these fucking cards.  Not one complaint."

d.  "I make them.  I buy the paper from my printer.  It's 25 bucks per card, my cost right, and then I sit there.  It takes about 20 minutes to do the card.  I practice the handwriting, the name, because every time I mess up on a name or a date it's trash.  I just lost 25 bucks."

e.  "I've gotten them to the Olympics in Tokyo, 3 Olympians and their coach in Tokyo, Amsterdam, Hawaii, Costa Rica, Honduras, I've got a company… has 30 people going to Canada every fucking day, Mexico is big, and like I said, I'm in 12 or 13 states so until I get caught and go to jail, fuck it I'm taking the money, ha!  I don't care."

36.    Van Camp also discussed advertising in the Parker Dining Guide.  When UCA1 inquired about the best means to pay Van Camp for the advertising, Van Camp replied that he wanted to avoid using the cash transfer application Venmo because he was receiving too much money into the Venmo account he shared with his wife from selling fake vaccination cards, stating: "The thing with Venmo is, normally I would say yes, but we've taken like $15,000 in Venmo because of those fucking cards because I am in 14 states now."  Van Camp also said: "The Venmo I have to save because my wife's like, dude, you're bringing so much money in Venmo from all over the country it's out of control . . . because I mail the cards by UPS and they Venmo me the money . . . some people are writing me checks which is great because then I go toss the check in another personal account.  My friend owns the bank, so I hide all that."  Van Camp later added: "I just don't want to totally Venmo because now it's crazy . . . I did 121 cards last week."

37.     When UCA1 asked Van Camp about purchasing additional fake vaccination cards, Van Camp stated that "I will drive to meet you because I have people in Utah, New York, Pennsylvania, Oregon, Texas," implying that he has sold fake vaccinations in those states.

38.     At the conclusion of the meeting, UCA1 told Van Camp that his wife's friend in Wyoming may want to purchase fake vaccination cards from Van Camp.  Van Camp indicated that he would be able to sell fake vaccination cards to this individual and would accept payment via Venmo or in cash.

*Van Camp Sold Fake Vaccination Cards to Undercover Agent 2*

39.     As part of this investigation, Undercover Agent 2 ("UCA2"), an HSI Special Agent, called Van Camp on September 23, 2021 at phone number 503-949-8779. During the call, which was recorded, UCA2 posed as UCA1's wife's friend from Wyoming.

40.     UCA2 began the call by telling Van Camp that UCA1 and his wife told UCA2 that Van Camp had something that UCA2 may find useful.  Van Camp responded, "Oh, my restaurant gift cards?"  UCA2 told Van Camp that she had seen a photograph of Van Camp's work.  Van Camp stated that he has the correct paper, ink, logos, and lot numbers, and stated that his fake vaccination cards are the "real deal."

41.     Van Camp said that some people had expressed concern about the vaccine lot numbers[2] he was using on his fake vaccination cards.  He stated that lot numbers are not as important as people think because an individual does not need to show identification, and insurance or credit cards are not involved, so all that matters is whether a person has a COVID vaccination card or not.  Van Camp also commented that he was prepared with guns and ammunition if the need ever arose for people to worry about lot numbers.

42.     UCA2 asked Van Camp if his vaccination cards would be sufficient if the digital passport[3] ever became a requirement.  Van Camp answered that the digital passport would not be a problem because "sheep" would upload their vaccination cards into the "bullshit" system, just like other applications that were already in existence.  Van Camp said that all UCA2 would have to do was keep a photograph on her phone of the fake vaccination card provided by Van Camp and show that photograph wherever vaccination cards were required, along with a matching identification card.  Van Camp said that he had used his fake vaccination card at concerts, airports, restaurants, and other places, and that it had worked 100% of the time.  Van Camp commented that his

---

[2] Based on my training and experience, a "lot number" is a unique number given by vaccine manufacturers to a specific batch of a vaccine, to track the location and expiration dates of the vaccines.

[3] Based on my training and experience, a "digital passport" is an application for a mobile device which is linked to a trusted repository of vaccine records and is used to verify whether an individual has received a vaccine.

vaccination cards were beautiful and said they were not fake in that they were the actual, real cards but obtained from him instead of a hospital.

43.     Van Camp then asked UCA2 why she needed the fake vaccination cards, stating that he always loves hearing why people need them.  UCA2 said that she did not want the vaccine and that her boyfriend was in the Air Force and was going to be required to get the vaccine.

44.     Van Camp told UCA2 to find a pharmacy in Wyoming that provides free COVID vaccines and to provide Van Camp the store number of that pharmacy.  Van Camp said that while pharmacies do not maintain vaccine databases, some hospitals do use a database named Epic, so he is avoiding listing hospitals as the place where a vaccine was administered on his fake vaccination cards.  Van Camp further stated that it would be even better if UCA2 could photograph a friend's legitimate vaccine card and send him the photograph, so that he could obtain a legitimate vaccine lot number.  Van Camp said that he had six legitimate Pfizer lot numbers from the Parker, Colorado area that he has been using and had lot numbers for nearly every state.

45.     Van Camp told UCA2 to text him the first and last names, middle initials, and birthdates of the individuals who wanted vaccination cards.  Van Camp stated that he would make the cards and then send photographs of the completed cards to UCA2 so that UCA2 could verify that the information was accurate.

46.     Van Camp said that he charges $150 per card and charges an additional $50 to fix a card if the mistake was the fault of the purchaser.  Van Camp explained that each card costs him $25 to make and that if he makes a mistake, he bears the cost.  He

commented that he messed up 23 cards during the previous week.  Van Camp further described how he wrote everything down from the texts he received, deleted everything from his phone, and instructed UCA2 to delete communications with him from UCA2's phone as well.  Van Camp stated that he was making 30 to 40 cards a night and that it was a full-time job.

47.    UCA2 told Van Camp that UCA2 needed fake vaccination cards for five individuals.  Van Camp advised UCA2 to send him their names and birthdates, stating that he would write the information down in his notebook and delete UCA2's text.  Van Camp said that UCA2 could pay for the cards by mailing him a check or paying through Venmo.  UCA2 confirmed that UCA2 would text Van Camp the requested information, including the store numbers of local pharmacies, within a few hours and ended the call.

48.    Approximately 30 minutes after the September 23, 2021, call between UCA2 and Van Camp ended, UCA2 sent text messages to Van Camp providing store numbers for three local pharmacies and providing the names and birthdates of five individuals for Van Camp to use when making the five fake vaccination cards.  Those text messages are shown below:



49.    UCA2 called Van Camp later that same day to make sure that he received UCA2's text messages.  Van Camp answered and confirmed that he received UCA2's text messages.  Van Camp said that he would call UCA2 back later in the day when he was making the cards to make sure everything was correct.

50.    As planned, UCA2 and Van Camp spoke again by telephone on September 23, 2021.  During the call, which was recorded, Van Camp began by confirming that the reference to "Osco" in UCA2's earlier text message did not mean "Costco."  UCA2 explained that Osco was the name of a pharmacy.  Van Camp asked if any of the individuals who wanted fake vaccine cards wanted particular dates listed for when they received the vaccine or whether they just wanted to use recent dates, which is what he normally uses.  Van Camp explained that if any of these individuals were getting on a

plane soon, the airlines prefer the last shot to be administered 15 days before the flight.

UCA2 responded that using recent dates should be fine.

51.     Van Camp also asked if any of the individuals who were getting the fake

vaccine cards were husband and wife.  UCA2 said that "Mark," which was one of the

names that UCA2 provided to Van Camp in her earlier text message, was her boyfriend.

In response, Van Camp said that he would create the cards for UCA2 and Mark to look

opposite, so that when they travel or go to a concert together, the cards will not look like

they came off an assembly line.  Van Camp advised that if UCA2 wanted additional cards

in the future, UCA2 should let him know if the individuals are married or likely to spend

time together, so that he can make those cards look different from one another and not

attract attention.

52.     Van Camp said that he could make the five cards requested by UCA2 that

night.  He asked UCA2 where he should mail the cards.  UCA2 asked that the cards be

mailed to a Post Office box.  Van Camp said that he uses UPS for shipping and would

check if UPS delivers to Post Office boxes.  He asked UCA2 to text him the Post Office

box address.

53.     Van Camp then stated that he was not making the fake vaccine cards

because he was bored, but because "we are in a fucking war."  He explained that he had

several guns and ammunition and was trying not to kill people.  He said he was

exhausting himself making the vaccine cards and did not have the energy to kill people

but that people "had to go."

54.     Towards the end of the call, Van Camp reiterated that UCA2 could pay for the fake vaccine cards by check or by Venmo, adding that while he allows his out-of-state customers to pay via Venmo, his wife was getting nervous because they had over $10,000 in their Venmo account.  UCA2 expressed a preference for Venmo, which Van Camp said was fine and commented that he had 12 states worth of purchases and payments to keep track of in Venmo.

55.     After the call ended, UCA2 sent a text message to Van Camp providing the Post Office box address where Van Camp should send the completed cards.  Van Camp responded via text several hours later, confirming that UPS could deliver to that address:



56.     On September 24, 2021, at approximately 1:36 p.m., UCA2 sent Van Camp the following text message: "Hey Robby! Sorry to bug ya. I'm guessing you're at work…Just wondering if all is still good?"  At approximately 1:40 p.m., UCA2 received a call from Van Camp, who advised that he would have the cards completed and mailed within the next 3-4 days.  Van Camp said that he would proof the cards with UCA2 by sending her a photograph of them to make sure everything was right, prior to mailing them. Van Camp further stated that he had checked with UPS and was able to confirm that it would deliver to a USPS post box.

57.     During this same phone conversation, UCA2 asked Van Camp about being charged $150 per card while UCA1 had paid $120 per card. Van Camp advised that mailing costs him $15 and that he had been making so many cards – usually 30-40 a night – that he had put himself into a position of "having bit off more than he could chew" and told UCA2 that he had produced 60 cards on the previous Monday night.  Van Camp stated that his production and sale of cards would not last forever, and that he was going on a cash run to quickly make and hide as much cash as possible.  Van Camp advised UCA2 that he would text his wife's Venmo account information, and that UCA2 could pay for the cards after reviewing them.

58.     On or about September 27, 2021, UCA2 received a telephone call from Van Camp, who advised that he had texted UCA2 a picture of the cards, and for UCA2 to review them for accuracy.  After concluding the telephone call, UCA2 reviewed a picture of the vaccination cards received from Van Camp, which was accompanied by the text, "These correct??":



59.     UCA2 confirmed that the cards were correct, and Van Camp indicated that he would place the cards in the mail the next day.

60.     On or about October 13, 2021, UCA2 received a package containing five fake vaccine cards, which was delivered to the address that UCA2 provided to Van

Camp.  The return address information stated "R. Van Camp" and included an address in Parker, Colorado.  The package contained an envelope, and inside the envelope were five fake CDC COVID-19 vaccination record cards, filled out with the names and dates of birth that UCA2 had provided to Van Camp and which matched the picture Van Camp previously sent to UCA2:





61.    On October 13, 2021, UCA2 sent a text message to Van Camp, confirming receipt of the cards, and inquiring about how much to pay Van Camp. Shortly thereafter, Van Camp called UCA2, and advised that his house was "like the DMV," that he had made 48 cards the night before, and that things were "never ending" with people coming to his house to pay for their cards and give him money. Van Camp advised that he prepared the cards while his wife was sleeping, as she could not help as she has a top secret security clearance and, "doesn't even like to know I'm doing it."

62.    Van Camp advised UCA2 that the cost for the cards would be $750 and asked if Venmo or mailing a check would be easier. UCA2 replied that Venmo would be easier, and asked Van Camp if his prices had gone up as UCA1 got his cards for $120 per card. Van Camp confirmed that his prices had increased, and advised that he was likely to start charging $200 per card because he could not continue producing 40 cards a night since he owns and is responsible to four separate businesses, and reiterated that he only produces cards while his wife is sleeping.

63.    Van Camp commented that he uses his wife's Venmo account for payment and sent a text message to UCA2 with the account information. UCA2 received the text from Van Camp, which appeared to be a screenshot of a Venmo account for Hutton, @Dionne-Hutton-1, which also contained a QR code for the same Venmo account:



64.     Van Camp advised UCA2 that if she wanted more cards to send him a text message, and that he writes the orders down in his "handy dandy little notebook," deletes all texts, and then creates the cards in the order which he received the requests, also taking into consideration the urgency of the need.

65.     UCA2 reminded Van Camp that her boyfriend, who was one of the recipients of Van Camp's cards, was in the Air Force, and asked Van Camp if the card was good enough to present to the Air Force and fulfill the mandate that all military members be vaccinated.  Van Camp said that he "had another thing" that he wanted to send her and said, "obviously we have the circle of trust here," and advised that he had another "hookup." At this point in the conversation UCA2 received another text from Van Camp, while still on the call.  This text was a screenshot of a profile established for "Robert Van Camp" upon what Van Camp described as the, "CDC, FDA federal website…protected by the V-safe program, accepted both national and international."

The screenshot included a QR code, vaccine type, and administration dates.  UCA2 asked Van Camp how he was able to obtain the profile, and Van Camp advised that he had "hacked the CDC."[4]

66.     Van Camp explained that another individual named "Sommer" assisted him, and she could build profiles on the CDC system.  Van Camp indicated that UCA2 should have her boyfriend send Van Camp the CDC COVID-19 vaccination record card Van Camp had previously prepared for him, and Sommer would use the card to create a profile on the CDC website which would reflect that UCA2's boyfriend was vaccinated against COVID.

67.     UCA2 asked Van Camp how he "hooked this up," and he responded that it took "a lot of money" and that he basically had reinvested his COVID card money into the endeavor.  Van Camp said that he charges $500 to establish a V-Safe profile, with $250 paid to Sommer for the profile and $250 for himself.

68.     On October 15, 2021, UCA2 sent a text message to Van Camp indicating that UCA2 was having difficulty using Venmo, and would send Van Camp a money order instead.  Van Camp replied to the text message and provided the address, "9241 Pikes Peak Way, Parker Colorado 80138," and a series of emojis.  UCA2 responded, "Sweet!!! Will get it this weekend!" and a series of emojis:

---

[4] According to the CDC website, the "V-Safe" program is a freely available smartphone-based tool where individuals can upload their vaccination dates, and the program will utilize text messaging and web surveys to give personalized health check-ins, and provide a platform for individuals to report side effects from the vaccine.



69.     On October 20, 2021, UCA2 purchased a money order issued by Western Union in the amount of $750 and mailed it via U.S. Postal Service to the address provided by Van Camp.  According to the Western Union money order tracking information line, the money order was cashed on October 27, 2021.

*Evidence Recovered from Van Camp's Trash*

70.     On or about October 14, 2021, agents from HHS-OIG and HSI conducted a trash pull of the trash that had been left for collection in the driveway of Van Camp's residence at 9241 Pikes Peak Way in Parker, Colorado.[5]

71.     The agents observed a garbage truck operator compress all the trash in the truck prior to collecting trash from Van Camp's residence, ensuring no additional trash was intermingled with Van Camp's trash.  The garbage truck operator then placed the garbage bags which were contained in a black garbage bin at Van Camp's residence into the garbage truck and turned off of Van Camp's street.  At that point the garbage truck operator allowed the agents to collect Van Camp's trash.

72.     An inspection of Van Camp's trash revealed significant evidence corroborating Van Camp's production and sale of fake COVID vaccination cards, as well as evidence that Wynn and Porrone are involved in the scheme.  Among other evidence, the following items were found in the trash collected from Van Camp's residence:

a.    Handwritten documents, including documents titled "Card List" and "Card Order$," which contained presumed names of card recipients, the quantity of cards, and the amounts charged:

---

[5] Agents confirmed that VAN CAMP's residence was located at this address through a variety of methods and it is also the same address that VAN CAMP provided to UCA2 in order for UCA2 to send a money order to VAN CAMP.



b. Another document titled "Card Order$" indicating that "Sommer"

purchased 38 fake COVID-19 vaccine cards for $5,700 ($150 per card).

Based on the investigation, including Van Camp's statements to UCA2,

agents believe that the Sommer referenced here is Sommer Wynn, the same

individual who Van Camp claimed to be paying to create fraudulent V-Safe

profiles on a CDC website for certain individuals who purchased fake

vaccine cards from Van Camp.



c. A handwritten letter addressed to "Dr. P" containing the names and dates of birth for three individuals, stating: "Thank you for your help! You're the best and I appreciate you!!"  In addition, a yellow sticky note was recovered which included "Dr. Paola" and notations "2x" and "3x." Accordingly, I assess that the references to "Dr. P" and "Dr. Paola" refer to Porrone, and indicate that she has provided names of individuals who desired fake CDC COVID-19 vaccination record cards to Van Camp, and then distributed the cards to those individuals.  This assertion is further corroborated by Venmo transactions between Van Camp and Porrone, as discussed below.



d. Sticky notes and slips of paper with names and addresses, which are

assessed to be the names and addresses of card recipients.  For example,

one sticky note identifies the name "Janet Smith" and an address in Dallas,

Texas.  Another document had a name and birthdate, with the notation

"First date of shot Oct. 4 – then three weeks later for 2nd":









e. Numerous discarded and torn up COVID vaccination cards, including the
examples shown below:



*Venmo Records Corroborate Sales of Fake CDC COVID-19 Vaccination Cards*

73.     As described above, Van Camp told UCA2 that he uses a Venmo account

that he shares with his wife, Hutton, to receive some payments for his fake COVID-19

vaccination cards.  In his communications with UCA2, Van Camp sent UCA2 a

screenshot which identified @Dionne-Hutton-1 as the user-name associated with that

Venmo account.

74.     Law enforcement obtained records from Venmo for the account associated with user-name @Dionne-Hutton-1.  Those records confirm that the account is held in the name of Dionne Hutton, which is the same name as Van Camp's wife.  In addition, the phone number listed for the account in Venmo's records is the same phone number that is publicly available for Hutton.

75.     Consistent with Van Camp's statements to UCA2, the financial transaction information provided by Venmo strongly corroborates that Van Camp received payments for his fake COVID-19 vaccine cards using the Venmo account held in his wife's name. Among other things, the transactional detail associated with this Venmo account reveals the following:

   a.   On September 9, 2021, Porrone paid Van Camp $680 over two transactions, with the note "stuff" for both payments.

   b.   On September 9, 2021, Wynn paid Van Camp $2400 over two transactions, with the notes "Lake Powell :festival_floaty:" and "Lake Powell."

   c.   In connection with a $500 payment made to the account on or about June 3, 2021, the payor included a note to the payment stating "Dr. Flouci."

   d.   In connection with a $200 payment made to the account on or about June 22, 2021, the payor included a note to the payment stating "Freedom."

   e.   In connection with a $200 payment made to the account on or about September 8, 2021, the payor included a note to the payment stating "Card."

f.  In connection with a $150 payment made to the account on or about September 16, 2021, the payor included the following symbol, which appears to be a syringe, as a note to the payment: 💉 .

g.  Between August and October 2021, at least eight payments made to the account included notes stating either "gift" or "gift card," or included the following symbol: 🎁 .  These notations are similar to Van Camp's instruction to UCA1 to refer to the fake COVID-19 vaccinations as "restaurant gift cards."

h.  Between approximately September 5, 2021, and October 11, 2021, the account received approximately 23 separate payments of either $120, $150, or an exact multiple of $120 or $150.  Based on Van Camp's communications with UCA1 and UCA2, as discussed above, Van Camp indicated that he had been charging $120 for each fake vaccine card in or around September 2021 but subsequently raised his price to $150 per card in or around October 2021.

76.    Moreover, the transactional detail from the Venmo account indicates that some of the individuals who were listed on the "Card List" and "Card Order$" documents recovered from the trash at Van Camp's residence made payments to the Venmo account to purchase fake vaccine cards.  For example, the "Card List" shown above in paragraph 72(a) includes a notation stating "Melissa Seattle 1x."  According to the Venmo records, the account received a payment from an individual named Melissa Thibodeaux on or

about October 13, 2021.  Venmo records further show that Thibodeaux's payment was made using an IP address that originated in Seattle, Washington.  Additionally, Thibodeaux's name is on one of the discarded and torn up fake vaccination cards that was found in Van Camp's trash on October 14, 2021, as shown above in paragraph 72(e).

77.     Similarly, as shown above in paragraph 72(d), a green sticky note recovered from the trash at Van Camp's residence listed the name "Diahn."  The Venmo records revealed that an individual identified as "Diahn Richards," paid the account $100 on August 25, 2021, with the notation "Birthday Gift," and $245 on September 7, 2021, with the notation "Consulting."  Venmo records further show that Richards' August 25, 2021 payment was made using an IP address originating in Fort Collins, Colorado, and that Richards' September 7, 2021 payment was made using an IP address originating in Dallas, Texas.

78.     Based on a review of the transactional data in the Venmo account, including the IP addresses associated with the individuals who made payments to the accounts, there is probable cause to believe that Van Camp has sold fake vaccination cards to individuals located in the Northern District of Texas, as well as in other parts of Texas and in several other states, including Colorado, Utah, Washington, Arizona, Oregon, and New York.  In addition, based on the review of Van Camp's trash and the Venmo records, there is probable cause to believe that Porrone and Wynn are conspiring with Van Camp by, among other things, receiving orders for and then distributing fake CDC COVID-19 vaccination record cards supplied by Van Camp.

**J.      REQUEST FOR PERMISSION TO SEIZE ELECTRONICALLY STORED COMMUNICATIONS, PATIENT RECORDS AND ASSOCIATED INFORMATION LOCATED IN THE TARGET ACCOUNT**

79.     Based on the facts presented in this affidavit, I submit that there is probable cause to believe that Van Camp committed the Target Offenses.  I further submit that there is probable cause to believe that the **Target Account**, described in Attachment A, was used as an instrumentality of those crimes, and that the **Target Account** contains evidence of the crimes that justifies the issuance of this warrant to allow examination of the information identified in Attachment B.

80.     In January 2022, Google produced records for the **Target Account**.  From these records, your affiant knows that the **Target Account** was created on or about November 1, 2006, by an accountholder named Robbie Van Camp.  Based on the investigation, I know that Van Camp uses the name "Robbie."  In addition, Google records show that the phone number associated with the **Target Account**, 503-949-8779, is the same number that Van Camp used when speaking with UCA1 and UCA2.

81.     Google records indicate that the **Target Account** uses numerous Google services, including Gmail, Google Hangouts, Google Drive, Google Docs, Google Cloud Print, and Google Payments.  Google records also indicate that the **Target Account** does not have any information listed in the deletion date area, thus your affiant believes that the **Target Account** is still an active account at Google.

82.     Your affiant submits that there is probable cause to believe that the **Target Account** was used in furtherance of the Target Offenses because, as described in detail

above, Van Camp used the **Target Account** to communicate with UCA1 in September

2021 regarding the preparation and sale of fake COVID-19 vaccination cards.

83.    Specifically, Van Camp provided the **Target Account** to UCA1 and told

UCA1 to send him the names to put on the fake vaccination cards via the **Target**

**Account**.  Van Camp further instructed UCA1 to refer to the fake vaccination cards as

"restaurant gift cards" in the email that UCA1 sent to the **Target Account**.  UCA1

followed Van Camp's instructions and sent the names for the fake vaccination cards to

the **Target Account**.  Van Camp then replied using the **Target Account** and requested

the individuals' middle initials, which UCA1 sent to the **Target Account**.  Thereafter, in

a message sent from the **Target Account**, Van Camp informed UCA1 that Van Camp

would have the fake vaccinations cards ready for their September 20, 2021 meeting,

which is when Van Camp did in fact sell the cards to UCA1.

84.    Moreover, based on the evidence presented above, there is probable cause

to believe that Van Camp has been producing and selling fake COVID-19 vaccination

cards since at least April or May 2021, when Complainant 1 witnessed Van Camp with a

pile of fake vaccination cards that Van Camp was offering to sell.  The evidence further

indicates that Van Camp has produced and sold a significant number of fake vaccinations

cards to individuals dispersed across the country and abroad.  Based on Van Camp's

statements alone, he has "done a thousand of these fucking cards," "done it for about 700

of [his] customers," "has gotten them to the Olympics in Tokyo, 3 Olympians and their

coach in Tokyo, Amsterdam, Hawaii, Costa Rica, Honduras," is "in 12 or 13 states," and

is producing up to 40 cards a night.  The scope of Van Camp's scheme is further

corroborated by the payments he received via Venmo, which indicate that he has sold fake vaccination cards to individuals in at least seven different states.

85.     Based on my training and experience, I know that individuals involved in criminal activity often use email to communicate about those activities.  This is particularly true in cases like this one where the individuals are geographically dispersed and where the criminal activity requires participants to share information with one another.  Here, the individuals who have purchased fake vaccination cards from Van Camp are necessarily required to provide their first name, middle initial, last name, and date of birth to Van Camp so that he can prepare the fake vaccination card on their behalf.  When purchasing multiple cards, purchasers are required to provide this information for multiple individuals.  Based on my training and experience, I know that individuals often provide this type of personal information through email because they believe it is a safe and private way to communicate it, and because they believe it is the best method to communicate such information accurately.

86.     In addition, based on my training and experience, I further submit that the fact that Van Camp used the **Target Account** to communicate with UCA1 regarding the preparation and sale of fake vaccine cards provides probable cause to believe that Van Camp also used the **Target Account** to have similar communications with other individuals who purchased Van Camp's fake vaccine cards.

87.     The **Target Account** is hosted on computer servers owned, maintained, controlled, and/or operated by the service provider Google, identified in Attachment A.

88.     This affidavit is made in support of an application for a search warrant

under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to

disclose to the government, records and other information in its possession pertaining to

the records or customer information associated with the records, including the contents of

communications between Google and the **Target Account**.  Attachment A describes the

records, and Attachment B further describes the information the government seeks to

seize.

89.     On or about September 15, 2021, October 19, 2021, and December 14,

2021, your affiant submitted preservation requests to Google for the **Target Account**.

Google has acknowledged receipt of the preservation notices and has agreed to comply.

90.     Google is a cloud business service that hosts a multitude of website content

and various cloud services.

91.     In general, cloud business and electronic communications service providers

ask each of their subscribers to provide certain information when registering for an

account.  This information can include the subscriber's full name, physical address,

telephone numbers and other identifiers, email addresses, and, for paying subscribers, a

means and source of payment (including any creditor bank account number).  Providers

typically retain certain transactional information about the creation and use of each

account on their systems.  This information can include the date on which the account

was created, the length of service, records of log-in (i.e., session) times and durations, the

types of service utilized, the status of the account (including whether the account is

inactive or closed), the methods used to connect to the account, and other log files that

reflect usage of the account.  In addition, providers often have records of the Internet

Protocol address ("IP address") used to register the account and the IP addresses

associated with particular logins to the account. Because every device that connects to the

Internet must use an IP address, IP address information can help to identify which

computers or other devices were used to access.

92.    In some cases, account users will communicate directly with a provider

about issues relating to their account, such as technical problems, billing inquiries, or

complaints from other users.  Providers typically retain records about such

communications, including records of contacts between the user and the provider's

support services, as well records of any actions taken by the provider or user as a result of

the communications.

93.    This application seeks a warrant to search all responsive communication

records and information under the control of Google, a provider subject to the jurisdiction

of this court, regardless of where Google has chosen to store such information.  The

government intends to require the disclosure pursuant to the requested warrant of the

contents of wire or electronic communications and any records or other information

pertaining to the customers or subscribers if such communication, record, or other

information is within Google's possession, custody, or control, regardless of whether

such communication, record, or other information is stored, held, or maintained outside

the United States.

## K.        SEALING AND NON-DISCLOSURE ORDER

94.      This investigation is ongoing.  Premature disclosure of the Application and
Affidavit for a Search Warrant may compromise the investigation by, among other
things, disclosing the precise matters being reviewed and the status of the investigation to
date.  Accordingly, it is respectfully requested that the Application and Affidavit for a
Search Warrant be sealed until further Order of the Court.

95.      Pursuant to Title 18, United States Code, Section 2705(b), it is also
respectfully requested that Google be ordered not to notify any other person regarding the
existence of the search warrant ("Non-Disclosure").  Non-Disclosure is justified because
the search warrant relates to an ongoing criminal investigation that is neither public nor
known to all of the targets of the investigation, and disclosure may alert the targets and
others to the ongoing investigation.  Accordingly, there is reason to believe that
disclosure of the search warrant will seriously jeopardize the investigation, including by
giving the targets and others an opportunity to flee, destroy or tamper with evidence,
intimated potential witnesses, or otherwise seriously jeopardizing the investigation.  *See*
18 U.S.C. § 2705(b).  It is therefore respectfully request that the Court order Non-
Disclosure, with the following exceptions:

a.   for the purpose of receiving legal advice, the Provider may disclose the
Non-Disclosure Order to an attorney for the Provider;

b.   for the purpose of making statistical reports (also known as
"transparency reports"), the Provider may disclose the fact that an order

under 18 U.S.C. § 2703(d) was received, the date of issuance, and court of issuance, provided that the Provider does not disclose the targeted account; and

c.  the Provider may disclose this search warrant one year after the date of the Non-Disclosure Order, but only if (1) the Provider has not received an order extending the period of non-disclosure for this warrant, and (2) the Provider has provided the Government with 15 days' notice before disclosing this warrant.  *See* 18 U.S.C. § 2705(b).

## L.    <u>RETENTION OF INFORMATION FOR AUTHENTICATION</u>

96.     In anticipation of litigation relating to the authenticity of data seized pursuant to the Warrant, the Government requests that it be allowed to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

## M.    <u>CONCLUSION</u>

97.     Based upon all the facts set forth above, there is probable cause that evidence, fruits, and property used to commit the crime of conspiracy to commit offenses and to defraud the United States, in violation of Title 18, United States Code, Section 371, fraud in connection with identification documents, in violation of Title 18, United States Code Section 1028, and false statements related to health care matters, in violation of Title 18, United States Code, Section 1035, is present in the **Target Account**.

98.     Further, I submit that there is probable cause to believe that evidence, fruits, and instrumentalities of this crime, as described above and in Attachment B, are located in the information described in Attachment A.

99.     In consideration of the foregoing, I respectfully request that this Court issue a search warrant for the **Target Account** authorizing the search of that location, as described more fully in Attachment A, and the seizure of items described in Attachment B.  Because the warrant will be served on Google who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

(Continued on the next page.)

I declare under penalty of perjury that the foregoing is true and correct to the best of my belief and knowledge this 31st day of January, 2022, in Dallas, Texas.

Lusilla Pacheco
Special Agent
U.S. Department of Health and Human Services
Office of Inspector General

The agent confirmed her signatures and swore to the veracity of the contents herein, on January 31, 2022, via reliable electronic means, as authorized by Fed. R. Crim. P. 41(d)(3).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

1.      This warrant applies to information associated with the email address listed

below, that is stored at premises owned, maintained, controlled, or operated by Google

LLC ("Google"), an electronic communications, website, and cloud services provider

headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043,

accepting service at the electronic address of USLawEnforcement@google.com.

**a.  alyjoemedia@gmail.com**

## ATTACHMENT B

Particular Things to be Seized:

I.   **INFORMATION TO BE DISCLOSED BY GOOGLE LLC (THE "PROVIDER")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the Government for each account or identifier listed in Attachment A:

a.  the contents of all emails associated with the account from March 1, 2021 to the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.  all records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.   all records pertaining to the types of service utilized by the user;

d.   all records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.   all records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

f.   the Provider is hereby ordered to disclose the above information to the Government within 14 days of service of this warrant.

g.   for purposes of authentication at trial, the Government is authorized to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

## II.   INFORMATION TO BE SEIZED BY THE GOVERNMENT

All information described above in Section I that constitutes evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371, 18 U.S.C. § 1028, and 18 U.S.C. § 1035, those violations involving Robert Van Camp and others, and occurring after March 1, 2021, to the present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.   Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

b.  Communications or records relating to COVID-19 vaccines, including vaccination programs, vaccination requirements and regulations, vaccination cards, vaccine lot numbers, the V-Safe program, and the digital passport;

c.  Communications or records relating to heath care providers that administer COVID-19 vaccines;

d.  Communications or records relating to producing, preparing, or selling purported Centers for Disease Control ("CDC") COVID-19 vaccination record cards;

e.  Communications or records relating to "gifts," "gift cards," "cards," and other similar words that may have been used to reference purported CDC COVID-19 vaccination record cards;

f.  Communications or records which convey an individual's name and date of birth in relation to production of purported CDC COVID-19 vaccination record cards;

g.  Communications or records relating to the delivery, transport, or shipment of purported CDC COVID-19 vaccination record cards;

h.  Communications or records relating to the receipt, transfer, use, or other disposition of proceeds generated by the selling of purported CDC COVID-19 vaccination record cards;

i.   Communications or records relating to the purchase or acquisition of materials used to manufacture or produce purported CDC COVID-19 vaccination record cards; and

j.   Information concerning persons who collaborated, conspired, or assisted (knowingly or unknowingly) in the commission of the criminal activity under investigation, including Dionne Hutton, Paola Porrone, and Sommer Wynn.

### III.   SPECIAL INSTRUCTION REGARDING REVIEW OF THE SEIZED MATERIAL

With respect to law enforcement's review of the records and information described in Section II (the "Seized Material"), law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the Seized Material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the Seized Material and the information and materials contained in them, as set forth in this Attachment B.

If law enforcement determines that all, some, or a portion of the information or materials within the Seized Material contain or may contain information or material subject to a claim of attorney-client privilege or work-product protection (the "Potentially Privileged Materials"), the Review Team is hereby ordered to: (1) immediately cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific

Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue.

Nothing in this addendum shall be construed to require law enforcement to cease or suspend the Review Team's review of the Seized Material upon discovery of the existence of Potentially Privileged Materials.